*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0350p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

STATE OF MICHIGAN,

         *Plaintiff-Appellee*,

    *v.*

THE SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS,

         *Defendant-Appellant*.

No. 13-1438

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:12-cv-00962—Robert J. Jonker, District Judge.

Argued: October 2, 2013

Decided and Filed:  December 18, 2013

Before:  ROGERS, STRANCH, and DONALD, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Edward C. DuMont, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellant.  Louis B. Reinwasser, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Edward C. DuMont, Seth P. Waxman, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellant.  Louis B. Reinwasser, Kelly M. Drake, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.  John F. Petoskey, FREDERICKS PEEBLES & MORGAN LLP, Peshawbestown, Michigan, William A. Szotkowski, Jessica Intermill, Andrew Adams III, HOGEN & HALLORAN, P.C., St. Paul, Minnesota, for Amici Curiae.

_____

### OPINION

_____

ROGERS, Circuit Judge.  The State of Michigan sued to enjoin the Sault Ste. Marie Tribe of Chippewa Indians from applying to have land taken into trust by the

Secretary of the Interior pursuant to the Michigan Indian Land Claims Settlement Act (MILCSA). The Tribe bought land from the City of Lansing, Michigan for the purpose of building a class III gaming facility. To purchase the property, the Tribe used funds appropriated by Congress for the benefit of certain Michigan tribes; MILCSA provides that land acquired with the income on these funds shall be held in trust by the United States. The district court enjoined the Tribe from making a trust submission under MILCSA on the theory that the submission would violate a compact between the State of Michigan and the Tribe. The compact requires that a tribe seeking to have land taken into trust for gaming purposes under the Indian Gaming Regulatory Act (IGRA) secure a revenue-sharing agreement with other tribes. Because the State is not suing to enjoin a class III gaming activity, but instead a trust submission under MILCSA, § 2710(d)(7)(A)(ii) of IGRA does not abrogate the Tribe's sovereign immunity, and the district court lacked jurisdiction. The issue of whether class III gaming on the casino property will violate IGRA if the Tribe's MILCSA trust submission is successful is not ripe for adjudication because it depends on contingent future events that may never occur. The injunction was therefore not properly entered.

## I.

IGRA provides a framework for government regulation of gaming activities on Indian lands, which include "any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe." 25 U.S.C. § 2703(4)(B). IGRA generally prohibits gaming on land taken into trust after October 17, 1988, unless it falls under one of four exceptions provided for in § 20(a). *See* 25 U.S.C. § 2719(a). Two of these exceptions are relevant to this case: one for lands taken into trust as part of "a settlement of a land claim," 25 U.S.C. § 2719(b)(1)(B)(i), and an exception that permits gaming by any tribe on any land if the Secretary determines, subject to the Governor's approval, that a gaming establishment would be in the best interest of the tribe and its members, and not detrimental to the surrounding community, 25 U.S.C. § 2719(b)(1)(A). In addition, IGRA divides gaming into three categories. Class I consists of traditional Indian games or social games for prizes of minimal value, and is regulated exclusively

by tribal governments; class II includes activities like bingo, and is regulated by tribes and the National Indian Gaming Commission, but not by the State; and class III, casino-style gambling, requires a tribal gaming ordinance, approval from the National Indian Gaming Commission, and an IGRA "compact" between the tribe and the State in which the gaming will occur.  25 U.S.C. § 2710(a), (d).

In 1993, the Tribe signed a compact with the State of Michigan to permit class III gaming on tribal lands, pursuant to § 2710(d) of IGRA.  Six other Michigan tribes signed virtually identical compacts at the same time.  *Grand Traverse Band of Ottawa & Chippewa Indians v. Office of U.S. Att'y for W.D. of Mich.,* 369 F.3d 960, 962 (6th Cir. 2004).  Section 9 of the Tribal-State compact is titled "Off-Reservation Gaming," and provides the following:

> An application to take land into trust for gaming purposes pursuant to § 20 of IGRA (25 U.S.C. § 2719) shall not be submitted to the Secretary of the Interior in the absence of a prior written agreement between the Tribe and the State's other federally recognized Indian Tribes that provides for each of the other Tribes to share in the revenue of the off-reservation gaming facility that is the subject of the § 20 application.

The Tribe currently operates five class III casinos on tribal lands in the Upper Peninsula of Michigan.

The Tribe entered into a Comprehensive Development Agreement with the City of Lansing, Michigan to purchase two parcels of land for the purpose of building gaming facilities.  Under the Agreement, the Tribe may choose to conduct either class II or class III gaming.  The Tribe acquired the first parcel using earnings from a tribal Self-Sufficiency Fund created for the Tribe under the Michigan Indian Land Claims Settlement Act, or MILCSA.  Such a purchase requires that the Tribe tender title to the Secretary to have the land taken into trust pursuant to § 108(f) of MILCSA. Pub. L. 105-143, § 108, 111 Stat. 2652, 2660–62 (1997).  The State anticipates that the Tribe will argue that taking land into trust under MILCSA would permit class III gaming to occur on the land without a revenue-sharing agreement.

The State filed suit against the Tribe, seeking a preliminary injunction prohibiting the Tribe from making a trust submission to the Secretary. Counts 1–3 alleged that a MILCSA trust submission would violate § 9 of the Tribal-State compact because the Tribe failed to obtain a revenue-sharing agreement with other Indian tribes. Count 4 alleged that the Lansing property, if acquired in trust, would not come within any exception for land taken into trust after 1988, and that if the Tribe were to conduct class III gaming on the property, it would violate IGRA.[1] The district court issued a preliminary injunction barring the Tribe from applying to have the Casino property taken into trust without a written revenue-sharing agreement with the other federally recognized Indian tribes in Michigan. The court found that it had jurisdiction over the claim because Section 2710(d)(7)(A)(ii) of IGRA abrogates the Tribe's immunity from suit by allowing a State to sue "to stop prospective class III gaming on prospective Indian lands." The district court likewise accepted the State's proposed alternative basis for jurisdiction, holding that because the Tribe "proposes to violate the forward looking provisions of Section 9 of the Compact" (with a MILCSA trust submission), Section 2710(d)(7)(A)(ii) of IGRA permits the court to enjoin *existing* class III gaming activity at the Tribe's other casinos in the Upper Peninsula of Michigan, even where those operations are not themselves unlawful. In addition, the court held Count 4 "ripe to the extent it puts directly at issue a current controversy between the parties over the possible application of an IGRA Section 20 exception to the Casino property that the Sault Tribe intends to have taken into trust."

The district court concluded that the four traditional factors a court must balance in deciding whether to grant a preliminary injunction weighed in favor of prohibiting the Tribe from making a trust submission to the Secretary of the Interior. First, the court reasoned that the State was likely to succeed on the merits because, in the absence of a revenue-sharing agreement, "the Sault Tribe would inevitably violate § 9 of the Compact by submitting its trust application" under MILCSA. The court reasoned that, without

---

[1]The State also filed suit against members of the Tribe's Board of Directors, but the district court dismissed these claims without prejudice. The district court also dismissed as unripe Counts 5 and 6, which alleged that any class III gaming on the Lansing property would violate the Michigan Gaming Control and Revenue Act, and would be a nuisance. None of these claims is on appeal.

dispute, the Sault Tribe intends to use the property for class III gaming and does not intend to secure a revenue sharing agreement. The court also reasoned that, in the Tribe's view, trust acquisition would trigger the land claim settlement exception to IGRA's prohibition on gaming on lands taken into trust after 1988. Second, the court found that the State would suffer irreparable injury without the preliminary injunction because the harm to the State "is in no way compensable by monetary damages." Third, the court decided that the risk of harm to others weighed in favor of granting the injunction because the other Tribes that § 9 of the Compact protects would be harmed by the trust submission without a revenue-sharing agreement. Finally, the court determined that the requested injunction would serve the public interest because the public benefits from enforcing all the terms of the Compact, including § 9.

The Tribe now appeals the order.

## II.

## Counts 1–3

With respect to the first three counts of the complaint, the State's suit to enjoin the trust submission is barred because the Sault Tribe is immune from suit. A tribe's sovereign immunity is abrogated "only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998). In addition, "Congress may abrogate a sovereign's immunity only by using statutory language that makes its intention unmistakably clear." *Florida v. Seminole Tribe of Fla.*, 181 F.3d 1237, 1242 (11th Cir. 1999). The compact between the Sault Ste. Marie Tribe and the State of Michigan expressly reserves the sovereign immunity of both parties.

Although the Tribe's immunity is subject to statutory exceptions, the asserted statutory exception does not apply. Section 2710(d)(7)(A)(ii) of IGRA, relied upon by Michigan as a statutory basis for abrogating tribal sovereign immunity, does not apply because this suit to enjoin taking land into trust is not a suit "to enjoin a class III gaming activity." 25 U.S.C. § 2710(d)(7)(A)(ii) grants federal jurisdiction over "any cause of

action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . . that is in effect." In other words, a federal court has jurisdiction under this provision only where (1) the plaintiff is a State or an Indian tribe; (2) *the cause of action seeks to enjoin a class III gaming activity*; (3) the gaming activity is located on Indian lands; (4) the gaming activity is conducted in violation of a Tribal-State compact; and (5) the Tribal-State compact is in effect. *See Michigan v. Bay Mills Indian Cmty.*, 695 F.3d 406, 412 (6th Cir. 2012), *cert. granted*, 133 S. Ct. 2850 (U.S., June 24, 2013) (No. 12-515) (emphasis added). Only the presence of elements 2 and 3 is disputed. Because enjoining a mandatory trust submission under MILCSA does not qualify as enjoining "a class III gaming activity" under § 2710(d)(7)(A)(ii) of IGRA, we need not reach the issue of whether the Lansing property is on "Indian lands."[2]

Enjoining a MILCSA trust submission is not the same as enjoining a class III gaming activity. Section 108(f) of MILCSA states that land purchased using the income on the Self-Sufficiency Fund (as it was in this case) "shall be held in trust by the Secretary for the benefit of the tribe." § 108(f), 111 Stat. at 2661–62. This submission to the Secretary to have the land taken into trust is triggered by the nature of the funds used to purchase the property, not by the prospective purpose (explicit or otherwise) for which the property was acquired. Because stopping the Tribe's trust application to the Secretary is not the same as stopping a "gaming *activity*" under § 2710(d)(7)(A)(ii) of IGRA, the provision on its face does not apply.

The State argues that it does apply because the Tribe has committed itself to a path that will result in conducting class III gaming activities in violation of the compact; in other words, the Tribe's sovereign immunity is abrogated so long as the State's

---

[2]This Court in *Bay Mills* held that there was no abrogation of sovereign immunity in that case by virtue of the third requirement of § 2710(d)(7)(A)(ii) in part because, except for one claim, plaintiff alleged that the gaming in question was *not* on Indian lands. *Id.* at 412–13. For the remaining claim, we held that the fourth requirement (conduct in violation of a Tribal-State compact) was not met. *Id.* at 413. Because the *second* requirement of § 2710(d)(7)(A)(ii) is not met in this case (suit to enjoin gaming activity), it is not necessary for us to determine the applicability of the third and fourth requirements. We therefore decline to hold this appeal in abeyance in anticipation of the Supreme Court's decision in *Bay Mills*, which presumably will address the reasoning of our court regarding the third and fourth requirements.

objective is to stop prospective class III gaming. Such a broad interpretation would unduly constrict a tribe's immunity. Any injunction would be permitted by means of a mere allegation that the challenged action might facilitate gaming activity. There is no support for such a wholesale abrogation of tribal immunity. The State relies on *Arizona v. Tohono O'odham Nation*, 2011 WL 2357833 (D. Ariz. June 15, 2011), where a district court enjoined a tribe from building a casino on property it had purchased, in violation of a Tribal-State compact. *Tohono* involved whether the land in question had yet become "Indian lands," and not whether the suit was to enjoin gaming. Indeed, the court stated explicitly that the nature of the claim asserted by the plaintiffs was "to enjoin gaming on Indian lands." *Id*. at *4. Here, the State seeks to enjoin the Tribe from asking the Secretary to take land into trust pursuant to a separate statute; it is not asking the court to enjoin class III gaming activity, or "the planned casino."[3]

The State moreover cannot get over this hurdle by suing to enjoin the class III gaming already occurring on tribal land if the alleged violation of the compact occurs independently of that pre-existing gaming. The State argues that even if a MILCSA trust submission is not a class III gaming activity, and even if the Lansing property is not Indian lands for the purposes of § 2710(d)(7)(A)(ii), the court nevertheless has jurisdiction to "enjoin existing gaming at the Sault Tribe's casinos in the Upper Peninsula of Michigan" because "all elements necessary for jurisdiction would be present." The convoluted logic of this argument depends on the idea that if a tribe even threatens to violate its compact (by applying to have land taken into trust), it loses the right to conduct class III gaming anywhere. Nothing in the Tribal-State compact or IGRA provides support for such a sweeping proposition, and the State's reliance on *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921 (7th Cir. 2008) is misplaced. There, the Seventh Circuit upheld jurisdiction over a suit to enjoin a tribe's class III gaming on the basis of its alleged violation of the dispute resolution provision of the compact. *Id*. at 927-40. *Ho-Chunk* supports the proposition that a court may enjoin class III gaming

---

[3]In Count 4, the State does ask the court to "enter an Order enjoining the operation of [Class III] games on [the Casino] property," which would qualify as a "class III gaming activity" under IGRA, but for the reasons set forth in Part III, *infra*, this issue is not ripe for adjudication.

when a compact violation arises out of the particular gaming to be enjoined; it does not provide authority for enjoining class III gaming at sites unrelated to the alleged compact violation.  Accordingly, this alternative rationale provides no basis for abrogating the Tribe's sovereign immunity under § 2710(d)(7)(A)(ii) of IGRA.

Our decision today does not affect the legal viability of a later suit to enjoin, as a violation of either § 9 of the Compact or § 2710(d)(7)(A)(ii) of IGRA, *class III gaming* on the land taken into trust.  The Tribe conceded as much at oral argument.[4]  Nor does a suit to enjoin class III gaming have to wait until such gaming is already occurring.

---

[4] The following exchange about § 2710(d)(7)(A)(ii) took place during oral argument:

MR. DUMONT: [W]e have never questioned that there will be a time for the State to bring this action, and to get adjudication if we are conducting class III gaming on this property, and even perhaps before we start conducting class III gaming once the property is in trust.

JUDGE: But you've clearly at the outset though expressed the intent to do class III gaming. That's front and center.

MR. DUMONT: If it is legally possible. And if I can say . . . as a practical matter, the Tribe will want that question resolved. So I think you can be confident that the Tribe will tee that question up, . . . which we would do either by going to the Interior Secretary or to the National Indian Gaming Commission and seeking an opinion that we are right about the "Indian lands" issue, and if that opinion is rendered, then it will be challengeable in federal court by the State or others under the APA.

During rebuttal, the Tribe's counsel discussed § 9 of the Tribal-State compact:

MR. DUMONT: Let's assume the State is correct about what Section 9 prohibits, which as you know, we believe they are not. What it entitles them to do is to bar class III gaming on that property at the end of the day.

JUDGE: What they say is the literal terms say it bars taking into trust.

MR. DUMONT: And they've made the argument now that . . . the mechanism it uses is to bar the trust at the beginning, but I want to be clear that—

JUDGE: You would be clear that you would not argue that because it has been taken into trust,  that there's no longer any issue under Section 9.

MR. DUMONT: That is correct.

JUDGE: You would not argue that?

MR. DUMONT: We would not argue that.

JUDGE: Instead you would say, it either applies or it doesn't, and if it does, then we can't do class III gaming.

MR. DUMONT: If we applied for the property improperly, and we don't have a revenue-sharing agreement, and if that provision applies, then we can't do class III gaming. That would be our position.

Injunctive relief can, and often is, brought before the challenged action occurs. *See, e.g.*, *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations." (quoting *Swift & Co. v. United States*, 276 U.S. 311, 326 (1928))).

## Count 4

Count 4 is not barred by sovereign immunity because the State does challenge class III gaming on Indian lands. However, this claim is not ripe for adjudication, and should have been dismissed.

Under each of the three relevant considerations in a ripeness analysis, the legal issues presented in the challenge to class III gaming in this case are not ripe for review. *See, generally*, *Abbott Labs. v. Gardner*, 387 U.S. 136 (1967); *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158 (1967); *Ammex, Inc. v. Cox*, 351 F.3d 697, 706 (6th Cir. 2003). First, the legal analysis would benefit from a more concrete factual context. Second, the actions of the Tribe and the federal government that the plaintiff State seeks to enjoin are subject to modification and have not been sufficiently finalized. Third, the State is not faced with the type of practical quandary that militates in favor of ripeness.

**1. Benefit to court of a concrete factual context.**

The court would benefit from a more concrete factual context before deciding whether class III gaming on the casino property would violate IGRA or § 9 of the Tribal-State compact if conducted without a revenue-sharing agreement. The issues are indeed legal. Essentially, they are (1) whether the exception in IGRA (to the prohibition on gaming on land taken into trust after 1988) for land "taken into trust as part of . . . a settlement of a land claim" applies to land taken into trust under MILCSA; and (2) whether Section 9 of the Compact, in the absence of a revenue-sharing agreement, prohibits gaming on land taken into trust under MILCSA. 25 U.S.C. § 2719(b)(1)(B)(i). These issues can best be analyzed if the circumstances of the taking into trust are known to the reviewing court. In particular, will the Secretary take the land into trust? What kinds of undertakings and qualifications, especially with regard to gaming, have been

made in connection with the taking into trust?  As the Tribe points out, there is even the possibility of judicial review of the Secretary's determination to take the land into trust. The reviewing court will be in a much better position to rule on the legal issues if it has before it the concrete circumstances under which the land has been taken into trust.  In contrast, the district court in the *Tohono O'odhom Nation* case found some aspects of the case to be ripe, relying in part on the fact that the Interior Department had already made a final decision to take the land in question into trust.  2011 WL 2357833, at *5.

Our concern in this regard is similar to that of the Supreme Court in *Toilet Goods*, which involved the legality of finalized rules providing for decertifying drug company employees who denied FDA inspectors access to manufacturing facilities. 387 U.S. at 158.  The challenge was not ripe where no decertification had occurred because the legal inquiry depended on a number of factors, including practical ones that could stand on a surer footing in the context of a specific application.  *Id.* at 165–66. Similarly, in *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998),  the Supreme Court held that a challenge to a U.S. Forest Service management plan was not ripe because even though the plan set logging goals, selected the areas suited to timber production, and determined which probable methods of timber harvest were appropriate, "review would have to take place without benefit of the focus that a particular logging proposal could provide."  *Id.* at 736; *see also Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003); *Ammex*, 351 F.3d at 706–08.  "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)).  The State's best argument is that the groundwork for class III gaming is being laid; but no class III gaming is currently occurring on the property, and indeed, it may never occur.  The Tribe has not been able even to make a trust submission under MILCSA, a process that involves its own contingencies (e.g., whether the Secretary agrees with the Tribe that she is required to hold the land in trust).  Even if the land is taken into trust, under the terms of the development agreement with the City of Lansing, however unlikely, the Tribe could choose to offer only class II, not class III, gaming.

Count 4 involves contingent, future events that may never occur; a more concrete factual context would therefore benefit the resolution of this claim.

## 2. Uncertainty that class III gaming will occur.

The second aspect of ripeness has to do with whether the defendant will actually carry out what is sought to be enjoined, and if so, how. Here, there are intervening steps required before gaming will come to pass. Most importantly, the land has to be actually taken into trust, and that action has to be finally approved administratively in the Department of the Interior. The Tribe will have to consider making concessions to avoid objections made by the State and other tribes in connection with this administrative determination. Moreover, the Tribe asserts the conceivable (albeit probably entirely impracticable) possibility that it will only offer class II gaming (i.e., essentially bingo). In any event, it is not sufficiently clear that class III gaming will ever be imminent. In *Toilet Goods* the Supreme Court relied on the consideration that "[a]t this juncture we have no idea whether or when such an inspection will be ordered and what reasons the Commissioner will give to justify his order." 387 U.S. at 163. Similarly, we have no clear idea whether or when the land will be taken into trust, and what reasons will underlie the administrative decision. Our reasoning in *Ammex* was similar. The suit in *Ammex* arose out of an action for injunctive relief in which Ammex, a seller of duty-free merchandise, including fuel, sought to bar the Michigan Attorney General from enforcing the Michigan Consumer Protection Act (MCPA) against Ammex. *Ammex*, 351 F.3d at 700. The claim was not ripe because Ammex had been granted the right to sell gas tax-free, so there was "no basis for assuming that the Attorney General [would] enforce the MCPA against Ammex." *Id*. at 709. Even if Ammex were ultimately forbidden from selling gasoline tax-free, it was still "far from clear what the Attorney General's policy would be with respect to enforcement of the MCPA against Ammex." *Id*. Like Ammex, the State in this case is suing to enjoin the Tribe from taking what the State alleges will be illegal action under IGRA. However, like the Attorney General's predicted course of action in *Ammex*, the course of action the State anticipates the Tribe will take here may never come to pass because the Secretary may refuse to hold the land

in trust, or the Tribe may choose (or indeed, be required) to conduct only class II gaming on the property. This consideration weighs strongly against ripeness. *See also Ohio Forestry*, 523 U.S. at 735.

**3. Hardship to the State in waiting for enforcement.**

Finally, the State is not subject to the type of hardship that can outweigh other concerns in a ripeness analysis. Any hardship the State might incur by waiting to bring this claim against the Tribe is not significant enough to offset the other factors that weigh against ripeness. This is not a situation where, as in *Abbott Labs*, "the claim was ripe in part because the challenged regulation had a direct and immediate impact on the day-to-day operations of the plaintiff drug company." *Ammex*, 351 F.3d at 709. The State will not be harmed because it will have the opportunity to bring this claim against the Tribe at a later time, and will not suffer any immediate consequences as a result of the delay.

The State is understandably concerned that if it must wait until the Tribe begins operating its casino before the State can assert abrogation of the Tribe's immunity under § 2710(d)(7)(A)(ii), the Tribe will then claim that the balance of harm swings decidedly in its favor, and that a permanent injunction should not be entered. This concern is not weighty because an ultimate determination that the challenged gaming is prohibited by IGRA or by the Compact will require an injunction regardless of the hardship to the Tribe from, for instance, wasted investment. A balance of equities of course strongly affects the exercise of discretion in deciding whether *preliminary* injunctive relief is warranted, where the legal issue has not yet been finally determined; but, in contrast, a final determination of illegality will necessarily trump equitable interests that can be accommodated only by violations of the law.

We do not now presume to determine the exact point at which a suit would be ripe to challenge class III gaming by the Tribe, when such a challenge is based on the theory that such gaming is prohibited by § 9 of the revenue-sharing agreement of the Compact, or by the limits on gaming on lands taken into trust after 1988. At some point the State must be able to obtain a judicial determination of whether one of these

provisions prohibits class III gaming at the Lansing location, before the gaming starts. It is sufficient to conclude that the limited statutory abrogation of sovereign immunity does not permit the issue to be litigated by means of an injunction to prevent purchased land from being taken into trust under MILCSA, and that a suit to enjoin class III gaming is presently not ripe.

### III.

The district court's preliminary injunction is reversed.